**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | Civil Action No. | |
| Plaintiff, | ) | | |
| | ) | **COMPLAINT** | |
| v. | ) | | |
| | ) | | |
| **CITY OF FARMERSVILLE, TEXAS,** | ) | | |
| | ) | | |
| Defendant. | ) | | |

The United States of America, by its undersigned attorneys, files this Complaint and alleges:

## INTRODUCTION

1.     The United States of America brings this civil action against the City of Farmersville, Texas ("City" or "Defendant"), for violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5.  The City violated RLUIPA when it denied the Islamic Association of Collin County ("Islamic Association") permission to develop a cemetery on property that the Islamic Association owned in the City's extraterritorial jurisdiction.  Under Texas law, municipalities have certain authority to regulate land use within their "extraterritorial jurisdiction," which, for Farmersville, includes the land extending out a half-mile from the City's borders.

2.     Following substantial public opposition that included numerous discriminatory comments aimed at the Islamic Association, Muslims, and Islam, and the ensuing election of City officials who campaigned on a platform of opposing the cemetery, the City denied the Islamic Association's application for permission to develop a cemetery.  During this process, City decision makers made discriminatory comments against Islam and acted in response to the religious animus that many members of the public expressed against Muslims.  The United States alleges that the

City violated RLUIPA by: 1) imposing a substantial burden on the Islamic Association and its members' religious exercise that is not in furtherance of a compelling governmental interest pursued in the least restrictive means; and 2) discriminating against the Islamic Association based on its religion and the religion of its members.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 2000cc-2(f).

4.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the Eastern District of Texas.

## PARTIES

5.     Defendant City of Farmersville is a municipality in Collin County, Texas.

6.     The City is governed by and acts through an elected five-member Farmersville City Council ("Council" or "City Council").  Councilmembers serve for two-year terms and perform all legislative functions in the City, including the review and approval of plat applications and other land use matters.  The Mayor, elected every two years, leads and conducts City Council meetings, sets the agenda for the Council, and may cast a vote on City Council matters in the event of a tie.

7.     The City Manager oversees the day-to-day operations of the City and its departments.

8.     The City Engineer advises the City regarding plat applications, building permits, and other development-related activities.

9.     The Planning and Zoning Commission ("Planning Commission") handles zoning and permitting requests, including plat application requests.  After conducting hearings, the Planning Commission makes recommendations to the City Council, which then votes to approve or disapprove the recommendation of the Planning Commission.

10.     The City is a "government" for RLUIPA purposes, 42 U.S.C. § 2000cc-5(4)(A), and is responsible for the acts and omissions of its agents and agencies, including the City Council.

## FACTS

### Farmersville's Platting Process

11.     The land the Islamic Association sought permission from the City to use as a cemetery is located near the junction of U.S. Route 380 and County Road 557 in the City's extraterritorial jurisdiction.  The City's Subdivision Ordinance governs the development of land in the City's extraterritorial jurisdiction and details the procedures for applying for a plat application.  The Subdivision Ordinance requires that an applicant seeking to develop land in the City's extraterritorial jurisdiction address, among other things: street layouts and widths; block and lot shape and size; access points; traffic requirements; required easements; utility requirements; sewage and storm drainage requirements; existing and planned roads; boundary lines; adjacent properties; square footage and measurements; topographic information; screening and retaining walls; landscaping and irrigation; the location of watercourses; the 100-year floodplain; and infrastructure plans.  The Subdivision Ordinance also requires compliance with the City's Comprehensive Plan and incorporates provisions of the Farmersville Zoning Code.

12.     The platting process for land in the City's extraterritorial jurisdiction requires separate review and approval of a concept plan, a preliminary plat, and a final plat.  Once the City Manager and City Engineer are satisfied that the concept plan is complete, the City Manager refers the concept plan to the Planning Commission for review and approval.  The Planning Commission must then approve or disapprove the concept plan.

13.     Once the concept plan is approved, the applicant then must submit a preliminary plat.  The preliminary plat consists of engineering plans, drainage calculations, traffic studies (if required), soil studies, proof of ownership, tax documents, an engineer's summary report, and other information.   The engineer's summary report must address, among other things, how

stormwater drainage will be handled.  Regarding stormwater drainage, an applicant must show that its post-development storm run-off will not exceed the pre-development run-off.

14.     The City Engineer and City Manager work with the applicant to ensure that the engineering plans and the plat application include all the information required by the Subdivision Ordinance.  If the City Engineer has concerns with the engineering plans, he or she must indicate to the applicant what needs to be corrected.  Once the preliminary plat application is in conformity with the requirements of the Subdivision Ordinance, the City Staff informs the Planning Commission that the preliminary plat is ready for consideration.  The Planning Commission must then consider the application at the next available meeting.

15.     If the preliminary plat is approved by the Planning Commission, the City Council may conditionally approve or disapprove a preliminary plat.  Because the approval of a preliminary plat "constitute[s] conditional approval of the final plat when all conditions of approval and when all procedural requirements set forth [in the plat approval process] have been met," Farmersville Subdivision Code § 65-164, the approval of a concept plan and preliminary plat are the primary hurdles that an applicant must overcome to develop land in the extraterritorial jurisdiction.  The final plat must contain the same information as the preliminary plat, any revisions or conditions imposed by the Planning Commission or City Council, all easements and rights of way, and certifications from the surveyor and land owner.  Once the final plat is approved by the City Council, the applicant must then file it with Collin County.

**The Islamic Association of Collin County and its Search for Land to Build a Cemetery**

16.     The Islamic Association of Collin County is a non-profit organization formed in 1997 to promote the religious interests of Muslims in Collin County and foster relations and understanding between Muslims and non-Muslims.  The Islamic Association operates a mosque on the west side of Plano, Texas.  The Islamic Association is a "religious assembly or institution" for RLUIPA purposes.  42 U.S.C. §§ 2000cc(a)(1) and (b)(2).

- 4 -

17.     As part of their faith, the Islamic Association and its members bury decedents in a cemetery with other Muslims.  The religious tradition observed by the Islamic Association and its members requires that the local community ensure that its members who lack financial means have a place to be buried and that funerals must take place within 24 hours of death.  After a body is ritually cleaned, it is wrapped in white cloth and prepared for burial.  Before the funeral ceremony, mourners gather at a local mosque to offer prayer.  Mourners then accompany the body from the mosque to the cemetery.  Further, as part of their worship practices and tradition, the Islamic Association's members visit the gravesites of loved ones on the anniversary of their death.

18.     The Muslim population in Collin County has grown significantly in the last twenty years.  In 2000, Collin County was home to approximately 6,000 Muslims.  Now, it is home to approximately 23,000 Muslims.  There are five mosques operating in Collin County, including the one operated by the Islamic Association.

19.     The Muslim community in Collin County currently buries decedents in two cemeteries—the Restland Cemetery in Dallas and a cemetery for Muslims in Denton.  Both of those cemeteries are nearly out of space.  The Restland cemetery has only a few hundred gravesites left and is "landlocked" and therefore has no room to expand.  The Denton cemetery has gravesites for only a few more years and cannot expand.

20.     In 2013, the Islamic Association held a summit with leaders from Collin County's four other mosques located in eastern Plano, McKinney, Frisco and Allen.  The summit members concluded that because of the rapid rate of growth of the Collin County Muslim community, the dwindling supply of burial plots at the Restland and Denton cemeteries, and the rising prices of burial plots, the development of a local cemetery that provided affordable burials for Muslims in Collin County was the top priority for the Muslim community.  The Islamic Association volunteered to spearhead the effort to develop a new cemetery, and the other mosques pledged to financially support its efforts.  The summit members agreed that, consistent with the Islamic

tradition of *Wakf* (roughly translated "endowment"), they would create an endowment fund that would subsidize funerals at the proposed cemetery to ensure that burials would be affordable.  The summit members also agreed that, to better serve the needs of the Collin County Muslim community, the new cemetery should be located within 25-30 minutes driving distance of Collin County mosques.

21.     The Islamic Association began to look for land to develop a new cemetery in Collin County that was proximately located to serve the Collin County Muslim community.  In Texas, a new cemetery may not be developed within one mile of the borders of a city with more than 5,000 persons and may not be developed within five miles of a city with a population of 200,000 or more.  *See* Tex. Health & Safety Code Ann. § 711.008.   Because of this prohibition, the Islamic Association had difficulty locating an appropriate place in Collin County.  The Islamic Association looked at land near cities and towns such as McKinney, Allen, Blue Ridge, and Anna, but the available land was either too expensive or too small to be used as a cemetery.  In early 2015, the Islamic Association identified a 34-acre plot in the extraterritorial jurisdiction of Farmersville ("Property") in relatively close proximity to the mosques and their congregants in Collin County.

**The Islamic Association's Efforts to Develop a Cemetery Were Met with Substantial Opposition**

22.     The Islamic Association hired an engineering firm, Halff & Associates ("Halff"), to assist with the development of the cemetery.  Halff drafted a concept plan ("2015 Concept Plan"), addressing several issues that had been raised by the City Engineer, including the location of public easements and a planned major highway that was slated to go through the Property to connect two county highways.   In April 2015, the Islamic Association submitted the 2015 Concept Plan to the City for approval.  The 2015 Concept Plan was reviewed by the City Engineer and City Manager.  On May 28, 2015, the Planning Commission unanimously approved the 2015 Concept

Plan.  Based on approval of the 2015 Concept Plan, the Islamic Association purchased the Property in July 2015.

23.     The community at large in Farmersville did not become aware of the Islamic Association's plans to construct a cemetery until June 2015, when then-Mayor Joe Helmberger and City Manager Ben White briefly spoke about it at a "State of the City" address at the local Rotary Club.  Once the community became aware of the Islamic Association's plans, there was significant opposition to the proposed cemetery.  Residents and non-residents spoke out in opposition to the cemetery, many publicly voicing their opposition on the basis that it would be a Muslim cemetery.  Emails were circulated around the community making claims that City officials had secretly approved the cemetery to avoid public scrutiny and that the Islamic Association was trying to build a terrorist training center.  Numerous residents wrote letters to the editor published in the local newspaper, the *Farmersville Times*, expressing strong opposition to the cemetery. Some letters included derogatory statements about Islam, including that it was a "violent" religion and that Muslims were going to impose "Shariah law."  Among the derogatory comments, residents threatened to desecrate the site of the proposed cemetery by dumping pig blood and pig heads on it.

24.     Vociferous opposition to the proposed cemetery dominated the regularly scheduled Planning Commission and City Council meetings in July and August 2015, even though the proposed cemetery was not on the agendas.  At these meetings, many objectors voiced their opposition on the basis of religion, including assertions that Islam is a "religion of hate and destruction," that the Islamic Association was seeking to "change our laws to conform to Sharia law," and that the "Islamic faith is a mindset to genocide [*sic*] those that do not believe as they do."  At the July 14, 2015 City Council meeting, a woman who claimed to speak on the behalf of the family of Audie Murphy (a celebrated World War II hero for whom the major highway in Farmersville is named and in honor of whom Farmersville celebrates Audie Murphy Day every

June) spoke in opposition to the proposed cemetery. She expressed concerns about "radicalized Muslims" and stated that "you can't tell the good guys from the bad guys." She said that allowing the Muslims to build a cemetery is like "opening Pandora's box" that cannot be closed and that "it amazes us that you are even considering it."

25.     On August 4, 2015, the City took the unusual step of organizing a town hall meeting at the Farmersville High School to discuss the proposed cemetery. In advance of the meeting, the City issued an "Informational Update Regarding the Proposed Muslim Cemetery" to assure residents that, among other things, there would be "no terrorist activity associated with this site." The meeting saw intense hostility being directed at the Islamic Association representative who attended, and who was repeatedly interrupted by the audience of between 300 and 400 people with shouted statements such as "You're lying!" and "You're not welcome here!"

26.     During the July and August 2015 City Council meetings and August 4, 2015 town hall meeting, City officials, including then-Mayor Joe Helmberger, unsuccessfully attempted to quell the crowd by pointing out that the City's discretion in considering the cemetery was limited because it was located in the extraterritorial jurisdiction.

**The Mayor and City Council Members Publicly Opposed the Proposed Cemetery**

27.     Several Farmersville citizens, who were or currently are elected City officials— including former Mayor Diane Piwko and current City Council members Mike Hurst and Donny Mason—publicly opposed the Islamic Association's efforts to develop a cemetery. They also made a number of negative public statements about the cemetery, Islam and Muslims. In February 2016, Piwko, Hurst, and Mason met in private a few days before the nomination deadline for the May 2016 election and agreed that they would all run for office. Piwko, Hurst and Mason all publicly opposed the cemetery as a part of their campaign platforms.

28.     Before she was elected Mayor in May 2016, Diane Piwko posted on Facebook that she was "against the cemetery" because the cemetery would displace ninety homes that were

allegedly contemplated by the City's Comprehensive Plan and that "Farmersville is being treated as dumping ground [*sic*] with a cemetery completely unattached emotionally from the citizens who live here."  She also advocated for a multi-prong strategy to stop the proposed cemetery by, *inter alia*: recruiting landowners near the Property to request that the City incorporate their property into the City's borders; canceling all City contracts with Halff Engineering; and forcing the Islamic Association to enter into a written agreement with the City regarding their burial practices and obtain a bond as a precondition to approval for the proposed cemetery in order to "tie up their mon[e]y."

29.     On August 11, 2015, Ms. Piwko posted on Facebook about Islam, quoting from the website "WikiIslam.net," which describes itself as "a community edited website which focuses on the critique of Islam . . ."  She posted excerpts from articles alleging that the number of Muslims in prisons in France, England and the United States exceeded their percentage of the population. Ms. Piwko commented below the post asking, "Where is the outrage that when city leaders held a public forum for the citizens to obtain information, the Islamic Association representative LIED at least 3 times . . ."  During the August 4, 2015 town hall meeting, Ms. Piwko accused the Islamic Association of lying about its intentions to care for the cemetery and stating, "you're not part of our community, you don't live here."

30.     In 2016, Ms. Piwko ran for Mayor of Farmersville on a platform that included opposing the cemetery.  She posted ads in the *Farmersville Times* stating "I am against the Muslim Cemetery for two reasons; it is bad business and I cannot imagine a cemetery thriving when there is an emotional distance between it and the community."  Ms. Piwko spoke against the proposed cemetery at campaign events, claiming that the cemetery would be a "bad use of our land."  Ms. Piwko was elected Mayor on May 7, 2016.

31.     Farmersville resident Mike Hurst, now a Councilmember, also publicly opposed the Islamic Association's efforts to develop a cemetery before and during his campaign. For example, during July 2015 City Council meetings, Hurst stated that the Audie Murphy family informed him it would remove its name from anything having to do with Farmersville if the City allowed the cemetery and told the City Council "shame on you guys" if it allowed that to happen. He also expressed concern about who would "police" the Muslim burial plots and "open the graves" to assure the burials at the cemetery were in accordance with Texas law. Hurst was elected to the City Council in May 2016 and was re-elected in May 2018.

32.     Councilmember Donny Mason opposed the cemetery while he was on the City Council. He was reelected in May 2018.

33.     Mike Hesse has been a member of the City Council since 2013. He, too, made statements opposing the cemetery while on the City Council.

### Mayor Piwko Takes Steps to Stop the Islamic Association's Proposed Cemetery and Retaliate against its Engineering Firm

34.     After she was elected, Mayor Piwko continued to oppose the cemetery. During a July 12, 2016 City Council meeting, she proposed a plan for Farmersville to enter into a "boundary agreement" with the neighboring city of Princeton (population of approximately 9,400 in 2016) such that Princeton's boundaries would be expanded to be within one mile of the proposed cemetery and trigger Texas Health & Safety Code § 711.008, which prohibits the construction of new cemeteries within one mile of a city with a population of more than 5,000 people. At the meeting, Mayor Piwko revealed that she and the City Manager had already met with Princeton's Mayor and City Manager to discuss this idea. Other Councilmembers deemed the proposal to be infeasible.

35.     Mayor Piwko also punished the Halff engineering firm for being "disloyal" in participating in the development of the cemetery. In June 2016, Mayor Piwko informed the

Farmersville Economic Development Corporation that she was uncomfortable with Halff obtaining City contracts because it "had associations with the Islamic Cemetery and specifically with the land search for the cemetery."  A few weeks later, at the August 9, 2016 City Council meeting, Mayor Piwko reiterated her concerns about Halff's connection to the proposed cemetery.

36.     On April 30, 2017, Mayor Piwko posted on her Facebook page, stating that "[a] year ago, Farmersville voters went to the polls and elected a new change of direction for the city." She then highlighted the "progress" made by the City Council, stating that "the [Islamic Association cemetery] is no longer being fast-tracked" and that "[c]omparing progress, we are at the exact same point as 23 months ago with considerable financial outlay by the applicant."  She concluded her remarks about what she and the City Council had done to thwart the Islamic Association's cemetery proposal by touting that "no additional city contracts have been awarded to the engineering firm representing the [Islamic Association] as were in work [sic] a year ago."

**The Islamic Association Moves Forward With its Plat Application and Addresses Every Concern Raised by the City**

37.     On February 27, 2017, the Planning Commission unanimously approved the Islamic Association's 2017 Concept Plan.

38.     The Islamic Association and Halff then worked with the City over a series of months to satisfy the City's preliminary plat requirements.  Halff engineers communicated with City officials, including the City Manager, City Engineer, Police Chief, and the Fire Marshall to ensure full compliance with all requirements.

39.     In May 2017, Halff engineer Hedrick and City Engineer Shankles communicated regarding the drainage requirements for the proposed cemetery.  Shankles informed him that the Islamic Association was required to show on its engineering plans that its post-development drainage would be the same as or less than the pre-development drainage.  Shankles asked Hedrick to provide several drainage calculations for the proposed development, including for the existing

county-owned 110-foot culvert at the southern boundary of the Property that went under County Road 557. Hedrick complied and provided Shankles with the requested engineering plans and calculations.

40. On June 7, 2017, after reviewing revised engineering plans and speaking with Halff engineers, City Engineer Shankles sent an email to Hedrick stating, "We are ok on the drainage." After sending the email confirming that the Islamic Association's drainage plan was approved, Shankles sent a letter to the City Manager stating that the Islamic Association's preliminary plat application "appears to be complete and ready for presentation" to the Planning Commission.

41. The Islamic Association's preliminary plat application proposed a cemetery of approximately 34 acres. The design plans called for internal roads, landscaping, screening, an irrigation system, a parking lot, a pavilion, restrooms, detention ponds, and 11,356 burial sites.

42. During the plat review process, the Islamic Association complied with every request made by the City. For example, Farmersville's Comprehensive Plan contemplated that a future major highway would eventually run through the Islamic Association's Property to connect two county highways. Upon request of the City, the Islamic Association agreed that it would provide the City with a right-of-way for this proposed highway, giving up the use of several acres of Property. The Islamic Association agreed to every other request made by the City, including, *inter alia*, performing a traffic study, widening the roads, installing a second entrance, adding a 50-foot buffer on the west side of the Property to accommodate the possibility that some of the adjacent landowners might have unlisted or unknown water wells, obtaining a supplemental report from its traffic engineer, providing a screening/fencing plan, and ensuring that its post-development drainage did not exceed the pre-development drainage.

43. In June 2017, the Islamic Association filed its preliminary plat application (the "2017 Preliminary Plat") with the Planning Commission. The 2017 Preliminary Plat was reviewed by a variety of City officials, including the City Engineer, City Manager, City Secretary, Fire

Chief, and Police Chief.  None of the reviewing officials identified any deficiencies in the Islamic Association's submission, and no concerns were raised to the Islamic Association about flooding, drainage, or other surface-water-related issues.

44.     The Planning Commission considered the 2017 Preliminary Plat on June 19, 2017. During the meeting, City Engineer Jim Shankles explained that the City's drainage standard requires that post-development run-off cannot exceed pre-development run-off and stated that the Islamic Association's plan satisfied the City's drainage requirements.  When asked by a Planning Commission member whether there would be a drainage problem on the cemetery, the City Engineer replied that it would be no worse than it currently was because the Islamic Association's planned detention pond would handle any new run-off.  The Planning Commission then voted unanimously to recommend approval of the 2017 Preliminary Plat and forward it to the City Council for consideration.  At this meeting, neither the Planning Commission nor the City Engineer indicated that they had concerns that potential drainage problems would cause gravesites to flood.  Mayor Piwko attended this Planning Commission meeting as a spectator.

**The City Council Denies the Islamic Association's 2017 Preliminary Plat Citing General Flooding Concerns**

45.     The City Council considered the Islamic Association's 2017 Preliminary Plat on July 11, 2017.  Present at the meeting were four of the five Councilmembers—Craig Overstreet, Mike Hurst, Donny Mason, and Mike Hesse—along with Mayor Piwko.  At the beginning of the hearing, the City Manager and City Engineer reported that the Islamic Association's plan met the City's "submission standards with no exceptions."  Before considering the application, the City Council and Mayor went into executive session for approximately an hour with the City Attorney.

46.     Upon returning to open session, Councilmember Craig Overstreet stated that he was concerned about drainage on County Road 557, because the soil is "highly expansive" and the land had a lot of vertical rise to it.  He noted that the June 19, 2017 Planning Commission minutes

indicated that there were flooding issues on County Road 557 when there were large rains.  Dylan Hedrick, the Islamic Association's engineer, acknowledged that the current culvert running south under County Road 557 was inadequate, but explained, as the City Engineer had previously advised the Planning Commission, that the development of the site would not contribute any additional run-off.  He further stated that the Islamic Association's proposal included an onsite detention pond that would contain any additional water flow due to the cemetery and that the water release-rate of the site would be the same as current conditions.  He further noted that the undersized culvert along County Road 557 was the property of Collin County and that only the County could upgrade it.

47.    Mayor Piwko then stated she was skeptical of the Islamic Association's proposal because she had seen "that area flood" and questioned whether existing water table studies were adequate.  Hedrick stated that the Islamic Association's proposal was based on "standard [Texas Department of Transportation] published numbers" for rainfall and flooding.  The Mayor responded that she believed those numbers were insufficient for the City's needs because "City Hall flooded."

48.    In an effort to address the Mayor's and the City Council's concerns, Hedrick offered that the Islamic Association could expand the size of the detention pond to accommodate more run-off.  The Councilmembers did not respond to this offer or ask the Islamic Association to address the drainage concerns.  Instead, Councilmember Hesse stated that run-off would cause a "public safety concern."  Councilmember Hurst then moved to deny the Islamic Association's application "to protect the best interests of our citizens of Farmersville" due to concerns "of drainage issues upon and across the property and flooding concerns crossing County Road 557." The City Council then unanimously voted in favor of denial.  During the meeting, neither the City

Council nor the City Engineer indicated to the Islamic Association that they had concerns that potential drainage problems would cause gravesites to flood.

**Following the Denial, the City Asserts That its Decision Was Based on its Concern That Less Than 1% of Graves Could be Inundated During a 100-year Storm Event**

49.     On August 3, 2017, after the City Council had denied the 2017 Preliminary Plat, the Islamic Association and its engineers met with Mayor Piwko, Councilmember Hurst, the City Manager, the City Engineer, and the City Attorney to discuss the City's basis for the denial.  During this meeting, the City for the first time asserted that it was concerned that, during severe flooding, a portion of the cemetery would potentially be inundated and that graves would be underwater. Councilmember Hurst remarked that he was concerned that buried bodies would be unearthed and that coyotes would run off with body parts.  At that meeting, the City also expressed concerns having nothing to do with its purported drainage concerns, including the cemetery's aesthetics, management, and long-term funding.  None of these concerns was a basis to reject the cemetery proposal under Farmersville's Subdivision Ordinance or Texas law.

50.     In November 2017, four months after its denial of the Islamic Association's 2017 Preliminary Plat, the City asserted that the 110-foot culvert under County Road 557 was inadequate to handle a 100-year storm, and that during such storm, water would flood the extreme southern portion of the cemetery and inundate a driveway and "at least" 80 of the proposed gravesites. Eighty gravesites would be less than 1% of the 11,356 gravesites that the Islamic Association proposed.  The City acknowledged that the City Engineer "did not conduct any independent flood or drainage studies on the Islamic Association or surrounding property" and that the City had no scientific basis for concluding that the alleged inundation of gravesites posed a threat to health and safety.  Mayor Piwko also acknowledged that the City Engineer found that the cemetery posed no safety risk to Lake Lavon, which is Farmersville's drinking water source.

**City Officials Have Acknowledged That Public Sentiment Played an Important Role in Their Decisions**

51.     In denying the Islamic Association's 2017 Preliminary Plat, the City Council was driven by anti-Muslim bias expressed by members of the public.  The *Farmersville Times* reported that on April 19, 2018, when Mayor Piwko was questioned at a candidate forum about her views on the proposed cemetery, she responded that "when she was elected . . . two years ago there was a very clear message coming from the citizens, that the majority of them did not want the Muslim cemetery to come in, whatever their reasons might have been."  Mayor Piwko has acknowledged that public sentiment plays a role in a plat application because "the Council serves to implement the will of the citizens, and so we have to be aware of what a majority of our citizens want."  City Manager Ben White and Councilmember Mike Hesse have also acknowledged that the views of the public play an important role in the City Council's decisions, noting that "political pressure" and the fear of "losing their jobs" are motivating factors.

**The City Had Numerous Alternatives to a Complete Denial of the Islamic Association's 2017 Preliminary Plat**

52.     Even though the City's alleged concerns about flooding in the proposed cemetery involved only one of the driveways and only about 80 out of 11,356 gravesites (or 0.7% of the total), the City Council issued a complete denial of the Islamic Association's plat application.

53.     As an alternative to a complete denial, City Engineer Shankles acknowledged that the Islamic Association could have moved the location of the graves.  He also acknowledged that the City Council, as it has done in other plat applications, could have informed the Islamic Association of its gravesite flooding concerns at the July 11, 2017 City Council hearing, and that had it done so, the Islamic Association could have addressed them.  He acknowledged that throughout the preliminary plat process, the Islamic Association had done everything that the City had asked of it and that he therefore had no reason to think that the Islamic Association would have resisted relocating the graves to address the City's alleged drainage concerns.  Furthermore,

had the Halff engineers been informed of the City's gravesite flooding concerns during the preliminary plat process, they could have amended their engineering plans to address the concerns.

54.    The City had other procedural means—other than a complete denial—of expressing its health and safety concerns and allowing the Islamic Association to address them.  As it has done in other plat applications, the City could have issued a "conditional approval" or "conditional disapproval" of the Islamic Association's application so that it could address the City's professed concerns before the Council made a final decision.  Rather than issue an outright denial, the City also could have asked the Islamic Association to waive the 30-day deadline for Council action so that the Islamic Association could address the alleged drainage issues.  The City has taken such an approach with other land-use applications.

## Additional Allegations

55.    The City's processing of the Islamic Association's 2017 Preliminary Plat, and the manner in which it evaluated it, has created considerable delay, expense and uncertainty for the Islamic Association in its efforts to develop a cemetery.

56.    The City's denial of the Islamic Association's 2017 Preliminary Plat has caused the Islamic Association to suffer significant financial loss, including, but not limited to, property tax payments, engineering fees, attorneys' fees, and professional fees.

57.    The Islamic Association had a reasonable expectation that its plan for the proposed cemetery, including the 2017 Proposed Plat, would be approved by the City Council.

58.    There are no readily available alternatives for the Islamic Association to develop a new cemetery to serve its congregants and other Muslims living in and around Collin County.

59.    The Islamic Association's proposed use of the Property as a cemetery does not present a threat to any compelling governmental interest of the City. The City did not identify a compelling governmental interest as a basis for its denial of the Islamic Association's 2017 Preliminary Plat, and such denial was not in furtherance of a compelling governmental interest.

60.     The City did not use the least restrictive means of addressing its purported concerns about flooding when it denied the Islamic Association's 2017 Preliminary Plat.

61.     The Islamic Association's efforts to establish a cemetery in the City's extraterritorial jurisdiction constitutes "religious exercise" within the meaning of 42 U.S.C. § 2000cc-5(7).

62.     The City made an "individualized assessment" of the Islamic Association's 2017 Preliminary Plat to establish a cemetery within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

63.     The City's denial of the Islamic Association's 2017 Preliminary Plat affects "commerce among the several States" within the meaning of 42 U.S.C. § 2000cc(a)(2)(B).

64.     The City's Subdivision Ordinance is a "land use regulation" within the meaning of 42 U.S.C. § 2000cc-5(5).

65.     At all times relevant, the City did not have in place procedures or practices to ensure City officials were able to satisfy their obligations under RLUIPA, including but not limited to, providing RLUIPA training to City officials and staff involved in religious land use determinations, and having established procedures to address complaints concerning denials of rights under RLUIPA.

## **VIOLATIONS OF RLUIPA**

## **COUNT I – SUBSTANTIAL BURDEN**

66.     The allegations set forth in the preceding paragraphs are incorporated by reference.

67.     The City's denial of permission for the Islamic Association to develop a cemetery on its own property has imposed a substantial burden on its religious exercise in violation of RLUIPA.  The City has not demonstrated that imposition of that burden furthers a compelling governmental interest using the least restrictive means.  42 U.S.C. § 2000cc(a).

68.     The policies and practices of the City in handling religious land use applications give rise to the likelihood of future unlawful conduct and the imposition of a substantial burden in the handling of future religious land use applications.

## COUNT II - DISCRIMINATION

69.     The allegations set forth in the preceding paragraphs are incorporated by reference.

70.     The City's treatment and denial of the Islamic Association's plat application for a cemetery constitutes discrimination against the Islamic Association on the basis of religion or religious denomination, in violation of RLUIPA.  42 U.S.C. § 2000cc(b)(2).

71.     The policies and practices of the City in handling religious land use applications give rise to the likelihood of future unlawful conduct on the basis of religion or religious denomination in the handling of future religious land use applications.

**WHEREFORE**, the United States seeks that this Court enter an order that:

1. Declares that the Defendant's denial of the Islamic Association's plat application, as alleged herein, violates RLUIPA;

2. Enjoins the Defendant, its officers, employees, agents, successors and all other persons in concert or participation with them, from imposing a substantial burden on the religious exercise of the Islamic Association and its members, and any other religious entities and institutions and their members, that is not narrowly tailored to serve a compelling governmental interest;

3. Enjoins the Defendant from discriminating against the Islamic Association and its members, and any other religious entities and institutions and their members, on the basis of religion or religious denomination;

4. Requires the Defendant, its officers, employees, agents, successors, and all other persons in concert or participation with them, to:

a.  Take actions necessary to restore, as nearly as practicable, the Islamic Association and its members to the position they would have been in but for the Defendant's unlawful conduct, including but not limited to granting the necessary approvals for the Islamic Association to use the Property as a cemetery; and

b.  Take actions necessary to prevent the recurrence of such unlawful conduct in the future, including but not limited to providing RLUIPA training to the Defendant's personnel, establishing procedures to address complaints of RLUIPA violations, and maintaining records and submitting reports relating to RLUIPA compliance; and

5.  Awards such additional relief as the interests of justice may require, together with the United States' costs.

Dated:  April 16, 2019

Respectfully submitted,

WILLIAM P. BARR
Attorney General

JOSEPH D. BROWN
U.S. Attorney, Eastern District of Texas

*/s Eric S. Dreiband*
ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

*/s Joshua M. Russ*
JOSHUA M. RUSS
Assistant United States Attorney
Eastern District of Texas
101 East Park Blvd, Suite 500
Plano, Texas 75074
Email: josh.m.russ@usdoj.gov
Tel.: (972) 509-1201
Fax: (972) 501-1209
Texas State Bar # 24074990

JAMES G. GILLINGHAM
Assistant United States Attorney
Eastern District of Texas
101 N. College Avenue, Suite 700
Tyler, Texas 75702
Email: james.gillingham@usdoj.gov
Tel.: (903) 590-1400
Fax: (903) 590-1436
Texas State Bar # 24065295

*/s Sameena Shina Majeed*
SAMEENA SHINA MAJEED
Chief

*/s Noah D. Sacks*
TIMOTHY J. MORAN
Deputy Chief
ERIC W. TREENE
Special Counsel
RYAN G. LEE
NOAH D. SACKS
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Northwestern Building, 7th Floor
Washington, D.C. 20530
Phone: (202) 305-0916
Email: noah.sacks@usdoj.gov

**ATTORNEYS FOR THE UNITED STATES**

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

United States of America

**DEFENDANTS**

City of Farmersville, Texas

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Collin County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Josh Russ, 101 E. Park Blvd., Suite 500 Plano, TX 75074 (972)509-1201
James Gillingham, 101 N. College Ave. Suite 700, Tyler Texas 75702

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability — ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander — Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability — Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine — ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability — Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation ☐ 470 Racketeer Influenced and |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle — **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability — ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal — ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | Injury — ☐ 380 Other Personal | Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice — Property Damage ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ Exchange ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights — **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting — ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment — ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations — ☐ 530 General | | | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment — ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other — **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education — ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 2000cc-2000cc-5 (Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"))
Brief description of cause:
City's denial of Islamic Association's application for cemetery violates RLUIPA.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   04/16/2019

SIGNATURE OF ATTORNEY OF RECORD   /s Joshua M. Russ

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____